Counsel of Record:
Elaine C. Greenberg
Daniel M. Hawke
Mark R. Zehner
Mary P. Hansen
G. Jeffrey Boujoukos
Scott A. Thompson
Securities and Exchange Commission
Philadelphia Regional Office
701 Market Street, Suite 2000
Philadelphia, PA 19106
Telephone: (215) 597-3100
Facsimile: (215) 597-2740

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | : | **Case No.** |
| | : | |
| **Plaintiff** | : | |
| | : | |
| | : | **COMPLAINT FOR** |
| **v.** | : | **VIOLATIONS OF THE** |
| | : | **FEDERAL SECURITIES** |
| **UBS FINANCIAL SERVICES INC.,** | : | **LAWS** |
| | : | |
| **Defendant.** | : | |

Plaintiff, the United States Securities and Exchange Commission ("Commission"), 701

Market Street, Suite 2000, Philadelphia, Pennsylvania 19106, alleges as follows against

defendant, UBS Financial Services Inc. ("UBS"), whose last known address is 1200 Harbor

Boulevard, Weehawken, New Jersey 07086:

### SUMMARY

1.      This case involves various fraudulent bidding practices by UBS, a registered

broker-dealer, involving the temporary investment of proceeds from the sale of tax-exempt

municipal securities in certain reinvestment products by state and local governmental entities in

the United States ("Municipalities"). As described below, UBS's fraudulent practices and

misrepresentations both affected the prices of the reinvestment products and jeopardized the tax-exempt status of the underlying municipal securities, thereby injuring numerous Municipalities. During a time period of over four years, UBS rigged at least 100 transactions, generating millions of dollars in ill-gotten gains, and threatening the tax status of over $16.5 billion of underlying municipal securities.

2.     From at least October 2000 through at least November 2004 (the "relevant time period"), UBS engaged in fraudulent practices and made misrepresentations in connection with the bidding of certain investments.  UBS played various different roles in these transactions.  In most of the tainted transactions, UBS placed bids, which constituted offers to provide the specific reinvestment product to the Municipalities.  In this role, UBS was commonly referred to as a "Provider."  In other instances, UBS acted on behalf of the Municipalities as the "Bidding Agent," collecting bids from other Providers offering to provide the reinvestment product.  From time to time UBS also negotiated interest rate swaps with other Providers who won the bids, in order to hedge against the interest rate risks of the underlying investments.  In this role, UBS, acting on behalf of its parent UBS AG, was commonly referred to as a "Swap Counterparty."

3.     As a Provider, UBS at times (a) won bids because it obtained advance information, typically from the Bidding Agent, concerning the competing Providers' bids ("Last Looks"); (b) won bids set up in advance by the relevant Bidding Agent to enable UBS to win because the Bidding Agent deliberately obtained off-market non-winning bids from other Providers ("Set-Ups"); or (c) facilitated Set-Ups that benefited other Providers by purposefully submitting sham off-market non-winning bids (known as "Courtesy Bids") to Bidding Agents.

4.     As a Bidding Agent, UBS at times arranged for Last Looks and Set-Ups for the benefit of other Providers.

2

5.      As a Swap Counterparty, UBS at times facilitated the payment of improper, undisclosed payments to Bidding Agents on behalf of the winning Provider.

6.      As a result of the aforementioned fraudulent misconduct during the relevant time period, UBS illicitly won bids for at least 22 municipal reinvestment instruments, rigged at least 12 transactions while acting as Bidding Agent for the benefit of other Providers, submitted at least 64 courtesy and/or purposefully non-winning bids, and in at least 7 instances facilitated improper, undisclosed payments to Bidding Agents, purportedly for services rendered in connection with an interest rate swap, on behalf of the winning Provider.  In each instance, UBS made fraudulent misrepresentations or omissions, thereby directly or indirectly deceiving Municipalities and their agents.

7.      By engaging in the misconduct described herein, UBS, a registered broker-dealer, violated Section 15(c)(1)(A) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C § 78o(c)(1)(A)].

## JURISDICTION AND VENUE

8.      The Commission brings this action pursuant to Section 21(d) of the Exchange Act [15 U.S.C. §§ 78u(d)] to enjoin such acts, practices, and courses of business, and to obtain disgorgement, prejudgment interest, civil money penalties, and such other and further relief as the Court may deem just and appropriate.

9.      This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].  UBS, directly or indirectly, used the mails or the means or instrumentality of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, securities by means of a manipulative, deceptive, or other fraudulent device or contrivance.

10.     Venue in this District is proper pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Certain of the acts, practices, and course of conduct constituting the violations of law alleged herein occurred, and UBS is found, within the District of New Jersey.

## DEFENDANT

11.     UBS is a Delaware corporation headquartered in Weehawken, New Jersey, and a registered broker-dealer pursuant to Section 15(b) of the Exchange Act. UBS has over 15,000 employees located in numerous offices across the United States. It is an indirect wholly-owned subsidiary of UBS AG, a Swiss banking corporation. Prior to March 2001, UBS was known as PaineWebber Incorporated. From March 2001 to June 2003, which was the time period during which most of the conduct alleged in this complaint occurred, UBS was known as UBS PaineWebber Inc., and after June 2003 it was known as UBS Financial Services Inc. During the relevant time period, UBS was consistently ranked as the second largest senior underwriter of municipal securities (by volume) in the nation. UBS operated and acted by and through its agents and employees, and in particular its conduct in this matter occurred by and through UBS representatives on its Municipal Reinvestment and Derivatives Desk (the "Desk"). UBS closed the Desk in June 2008.

## RELATED PARTY

12.     UBS AG is a Swiss banking corporation headquartered in Basel and Zurich, Switzerland that acts through, among other offices, branches in Stamford, Connecticut and London, England. At times, UBS submitted bids for investment products on behalf of its parent UBS AG, and if it won, the resulting contracts were with UBS AG, not UBS. Similarly, although the terms of a particular interest rate swap with a Provider were typically negotiated by

representatives of UBS, the actual Swap Counterparty was UBS AG, acting through its London, England branch or its Stamford, Connecticut branch.

## FACTS

**A.        Background**

13.     Municipalities from time to time publicly offer and sell tax-exempt securities in order to finance various capital projects such as schools, highways, and hospitals, or to refinance existing bonds or notes.  When these municipal securities are sold, the proceeds are often not instantly spent.  Instead, the proceeds are temporarily invested pending their use for the original purpose of the securities offering.  A significant portion of such proceeds are invested in financial instruments tailored to meet Municipalities' specific collateral and spend-down needs, such as guaranteed investment contracts ("GICs"), repurchase agreements ("Repos"), and forward purchase agreements ("FPAs").  GICs, Repos, FPAs and the underlying municipal securities all constitute securities or contracts for the purchase of securities.

14.     GICs are typically contracts providing for the repayment of principal and a fixed rate of interest on the amount invested for a specified period of time that permit the investing Municipality to withdraw funds as needed.  GICs are generally uncollateralized and issued by special purpose entities that obtain "guarantees" in the form of insurance policies from highly rated insurance companies.   Repos are contracts that provide for the purchase by Municipalities of U.S. government securities from entities such as UBS, under which the seller also agrees to buy back, or repurchase, those securities in accordance with the needs of the Municipality at specified prices on one or more future dates.  FPAs similarly are contracts for the purchase by Municipalities of U.S. government securities from entities such as UBS, but instead of being

repurchased by the seller, the underlying U.S. government securities mature on future dates in accordance with the needs of the Municipality.

15.     In order to preserve the tax-exempt status of municipal securities under the relevant tax regulations [26 C.F.R. § 1.148-5(d)(6)], generally these investments must be purchased at fair market value. Typically, Municipalities establish fair market value through a competitive bidding process as set forth in the tax regulations. Among other things, these detailed tax regulations require the Municipality issuing the municipal securities to make a bona fide solicitation for the purchase of investments, provide that all prospective Providers bidding on an investment must be given an equal opportunity to bid, mandate that all prospective Providers bidding on an investment make detailed written representations concerning the bidding process, and require similar written certifications from the winning Provider ("Provider Certificates"). A failure to comply with these bidding requirements creates a rebuttable presumption that the investment was not purchased at fair market value. Conversely, for certain types of investments, compliance with these detailed bidding regulations creates a safe harbor for establishing the fair market value of the reinvestment instruments.

16.     In situations where the tax-exempt status of the underlying municipal securities were not at issue, Municipalities also at times use the competitive bidding process to ensure that they receive the best price for the instruments at issue and to avoid the appearance of affording any particular entity favored treatment.

17.     Various major financial institutions, including commercial banks, investment banks, insurance companies, broker-dealers, and financial services firms, acting as Providers, offer and sell GICs, FPAs, and Repos, either directly or through agents, to Municipalities for the investment of proceeds from tax-exempt municipal securities. UBS acted as a Provider for

6

certain of these products, and typically submitted bids for such products to Municipalities or to Bidding Agents acting on behalf of Municipalities.

18.     Providers of GICs may hedge the interest rate risk they assume when winning the bid for a specific GIC.  A common method of hedging this risk is for the Provider of the GIC to enter into an interest rate swap with a commercial bank on terms that mirror the terms of the GIC ("Swaps").  UBS AG had relationships with at least two Providers of GICs pursuant to which it entered into such Swaps.  The contracts governing these Swaps consisted of master agreements that were supplemented by written confirmations, executed by officers of UBS AG and the Providers, which specified the terms of a particular swap.  The individuals on the Desk at UBS negotiated the terms of these Swaps.  Given the nature of these relationships, UBS AG had no need to hire a broker or other third party to assist it in finding, or negotiating the terms of, any of these Swaps.  Indeed, many UBS AG Swap confirmations transmitted to the Provider stated there were no brokers involved in the transaction.

**B.     Fraudulent Conduct**

19.     Although the bidding process should have been conducted at arm's length, during the relevant time period, UBS engaged in fraud through its bid-rigging.  The fraud at UBS involved the conduct of supervisors, officers, and other agents and employees, with respect to at least 100 fraudulently run bids.

20.     UBS, when acting as Provider, at times received via telephone from certain Bidding Agents, at or about the time that certain bids were due, information about the prices, price levels, rates, conditions or other information about other Providers' bids.  UBS in turn used this information to formulate its original bid; to raise a losing bid to a winning level; and/or to lower a winning bid so that it could win with a wider profit margin.

21.     On many occasions, prior to the time the bids were due, UBS and certain Bidding Agents would agree, in advance, to arrange the process so that UBS would win with large profit margins.  These Set-Ups were arranged in various ways, including, among other things, obtaining off-market Courtesy Bids from other Providers; drafting the bid specifications to favor UBS; limiting the pool of prospective Providers; and by including in the pool of prospective Providers firms that could not effectively compete.

22.     UBS failed to disclose the aforementioned misconduct and misrepresented in its bid submissions and Provider Certificates that, among other things:  UBS's bids were arms-length bids; UBS had not consulted with any other potential provider about its bids; its bids were determined without regard to any other formal or informal agreement that it had with the issuer or any other person (whether or not in connection with the bond issue); and/or that its bids were not submitted solely as a courtesy to the issuer or any other person for purposes of satisfying the requirements of the tax regulations.  These false representations and certifications were forwarded to the Municipalities and/or their agents by means and instrumentalities of interstate commerce, usually telephone calls and subsequent facsimile transmissions.

23.     Similarly, at times when UBS was acting as a Bidding Agent, UBS falsely represented, among other things, that it had conducted a bona fide solicitation for the investments that were the subjects of the requests for bids; that all prospective Providers bidding on the investments had had an equal opportunity to bid; that no such prospective Provider was provided information concerning another's bid or given the opportunity to review another's bid; and/or that UBS had not conveyed any material information to any prospective Provider intended to induce it to bid a lower amount than that which was induced by the bid request letter.  UBS also acknowledged in its certificates as Bidding Agent that the certificates were given as a basis for

8

bond counsel's opinion with regard to the exclusion of the interest on the underlying municipal securities from gross income for federal tax purposes.

24.     UBS, on behalf of UBS AG acting as a Swap Counterparty, at times induced the purchase or sale of GICs to favored Providers of GICs by agreeing to facilitate improper, undisclosed payments to Bidding Agents.  These payments induced those Bidding Agents to rig the bidding process for the benefit of those GIC Providers.  The improper, undisclosed payments were hidden from both the Municipalities and from compliance personnel at the favored GIC Providers by associating the payments with the Swaps.  In these instances, based on misleading information from UBS, UBS AG prepared and disseminated false and misleading Swap confirmations to Providers that asserted that no brokers were involved in the Swap transaction

**C.**          **Representative Tainted Transactions**

25.     UBS engaged in fraudulent bidding practices at least 100 times during the relevant period through Set-Ups, Last Looks, submitting Courtesy Bids, and facilitating improper, undisclosed payments.  The following examples illustrate the conduct described above:

*Transaction One*

26.     Transaction One was a Last Look.  In October 2001, a Municipality located in Massachusetts publicly offered $823,845,000 principal amount of purportedly tax-exempt municipal securities. Among other items, this financing required the bidding of a $638.5 million FPA. UBS acted as the Bidding Agent.  With respect to each bid, the potential provider was required to submit the bid initially via telephone and then follow it up with a signed copy of the bid, which was sent to the Bidding Agent via fax.

9

27.     In late October 2001, a managing director on UBS's Desk hosted a breakfast meeting for a representative of Provider A.  At that meeting, among other items, another UBS representative suggested UBS could help Provider A win the Massachusetts Municipality's upcoming FPA.  Consistent with the aforementioned offer, the UBS representative, on October 31, 2001, provided Provider A with a Last Look, thereby allowing Provider A to win the transaction over Provider B, which had submitted the cover bid.

28.     In return for that Last Look, Provider A paid UBS at least $175,000 in improper, undisclosed payments in early 2002 for services not rendered.

29.     On November 15, 2001, at the closing for the underlying municipal securities offering, an officer of UBS falsely represented in writing that UBS had run a bona fide solicitation, all of the prospective Providers were given an equal opportunity to bid, no potential Provider was given the opportunity to review other bids, and the price at which the investment was purchased was determined in an arm's length transaction.  Moreover, the UBS certificate as Bidding Agent explicitly represented that the Massachusetts Municipality and its bond counsel could rely on UBS's description of the bidding process for purposes of determining compliance with the relevant tax law requirements.

30.     UBS arranged to have copies of its false representations provided to the Massachusetts Municipality and/or its agents.

***Transaction Two***

31.     Transaction Two was a Set-Up.  In June 2002, the Massachusetts Municipality publicly offered $1.8 billion principal amount of purportedly tax-exempt municipal securities. Among other items, this financing required the bidding of a $1.465 billion FPA.  UBS acted as Bidding Agent on behalf of the Massachusetts Municipality.  This bidding process was

structured so that the firm providing the earliest escrow roll-over date won the right to provide all of the investments.

32.     Provider B was upset that Provider A had won Transaction One.  UBS mollified Provider B by promising its representative that it would receive favored treatment on Transaction Two.  UBS also communicated to Provider A that Transaction Two was going to be rigged for the benefit of Provider B.

33.     On the morning of the bid, representatives of Provider A and Provider B discussed with each other over the telephone how they were planning to bid.  Provider A then submitted a bid of early October 2010, which represented a level slightly off what Provider A thought was a fair price.  The UBS representative receiving Provider A's bid was surprised, and informed Provider A that its bid was too aggressive.  In response, Provider A's representative made a quick call to Provider B's representative's cell phone.  After that call to Provider B's representative and within 5 minutes of the submission of its original bid, Provider A submitted a revised, less competitive bid with a date of January 15, 2011, which UBS was willing to accept.

34.     UBS also obtained Courtesy Bids from two other, non-competitive, banks for this bid, telling them the level at which they should bid to be "safely back" such that they will be unlikely to win.  The investment was awarded to Provider B, which generated gross earnings of $5.3 million on the transaction.

35.     On July 2, 2002, at the closing for the underlying municipal securities offering, a managing director at UBS falsely represented in writing that UBS had run a bona fide solicitation, all of the prospective Providers were given an equal opportunity to bid, no potential Provider was given the opportunity to review other offers, and the price at which the investment was purchased was determined in an arm's length transaction.  Moreover, UBS explicitly

represented that the Massachusetts Municipality and its bond counsel could rely on UBS's description of the bidding process for purposes of determining compliance with the relevant tax law requirements.

36.    UBS arranged to have copies of its false representations provided to the Massachusetts Municipality and/or its agents.

**Transaction Three**

37.    Transaction Three was a Set-Up and involved the use of a Swap to facilitate a improper, undisclosed payment to a Bidding Agent.  In October 2001, a major healthcare system (the "Healthcare System") based in Colorado publicly offered $351,015,000 principal amount of purportedly tax-exempt municipal securities through conduit issuers in Kentucky, Colorado, and Ohio  (the "Healthcare Bonds").  UBS, acting as Bidding Agent on behalf of the Healthcare System, in January 2002, conducted the bidding process for the investment of $100 million of Healthcare Bond proceeds in a GIC.

38.    During a telephone call on January 24, 2002, a week prior to the bid, a UBS representative described the proposed Healthcare transaction to a Provider C representative, and asked him "who do you want to go against?"  That Provider C representative then suggested a few competing firms because "they're usually not that aggressive."  By the end of the conversation, they had agreed on a list of non-competitive firms against which Provider C would be comfortable bidding.  UBS then circulated the request for bids to Provider C and those non-competitive firms.

39.    On the morning of the day of the bidding, the UBS representative discussed with the Provider C representative the amount of money each wanted to make on the transaction.  As Bidding Agent, UBS was going to earn 2.5 basis points, equal to $25,000, an amount fully

disclosed to the Healthcare System.  However, the UBS representative wanted to make an

additional undisclosed fee of 5 basis points, equivalent to $50,000, from the winning provider by

serving as the Swap Counterparty.  Given those costs, the Provider C representative pointed out

that he needed to win the GIC at around 2.48% to reach his own earnings target.  The Provider C

representative told UBS, that if he was paying 5 basis points on the Swap, he didn't want to bid

too high of an interest rate on the GIC.

40.     The UBS representative then obtained indications of bids from the other

Providers.  At 1:15 pm on the day of the bidding, he called the Provider C representative.  The

UBS representative knew that Provider C could win the bid at a rate lower than the 2.48%

Provider C was willing to pay.  The UBS representative started the conversation by asking

whether a level of 2.38%, which is to say a bid that would be 10 basis points, or $100,000, more

profitable for Provider C than what was discussed that morning, still "worked."  The Provider C

representative quickly agreed, and submitted a written bid at a rate of 2.38%.

41.     The Provider C representative then had a separate conversation with a second

UBS representative, concerning the pricing of the Swap.  That second UBS representative

haggled with Provider C because he had learned how the bidding for the GIC went, and thought

there should be "some profit sharing, if you will" on the transaction.  Ultimately, in exchange for

UBS rigging the bidding in its favor, Provider C increased by $25,000 the amount it paid UBS

AG for the Swap, such that UBS made a total of $100,000 on this transaction; $25,000 as

Bidding Agent and $75,000 on the Swap.

42.     On February 6, 2002, at the closing on the GIC, UBS falsely represented in

writing that it had an arm's length relationship with Provider C, did not convey any information

to Provider C that would tend to induce it to bid a lower interest rate, and did not receive any

payment from any person in connection with the GIC, other than the disclosed $25,000 fee as Bidding Agent. Moreover, UBS acknowledged in writing that bond counsel for the Healthcare System was relying upon its representations.

43.     UBS arranged to have copies of its false representations provided to the Healthcare System and/or its agents.

*Transaction Four*

44.     Transaction Four was a Set-Up. In June 2002 a Municipality located in Rhode Island publicly offered $649.73 million of purportedly tax-exempt municipal securities. Among other items, the financing required the bidding of a $343 million FPA with respect to a portfolio of government securities. Bidding Agent B acted as Bidding Agent on behalf of the Municipality. As an economic matter, the Provider willing to sell this portfolio at the lowest cost to the Municipality would win.

45.     The day before the bid, a UBS representative called a representative of its toughest competitor, Provider A, to alert him that UBS wanted to win the transaction, "but may be in the market to buy paper." Over drinks that night, the two of them agreed that in return for Provider A not bidding on the transaction, UBS would agree to purchase the underlying government securities from Provider A at excessive, off-market prices that would result in the two firms equally sharing the resulting profit.

46.     Separately, UBS asked Provider D to provide a deliberately non-winning Courtesy Bid. Instead of conducting his own analysis, the Provider D representative simply asked the UBS representative what level he was thinking of. The response was "mid to high 295" (i.e., a purchase price just below $296 million), which left unclear whether this represented the level at which UBS wanted to win, or the off-market level at which Provider D should bid.

Provider D then submitted to Bidding Agent B a bid equivalent to a purchase price of $295.7 million, only to be surprised to learn that he had provided the best bid so far.  Panicked, the Provider D representative then called UBS back to ask whether the $295.7 million bid was "too tight," only to be reassured "no, that's great."

47.     Ultimately, UBS, bidding on behalf of its parent UBS AG, won the transaction with a bid equivalent to a purchase price of $295.3 million, making a profit of $1.425 million. Complying with its earlier illicit agreement, UBS then shared its profits with Provider A by acquiring the underlying government securities from Provider A at prices that in aggregate were $700,000 greater than their market value.  The Provider D representative attempted to avoid the IRS regulations by drawing a line through the representations on his bid form to the effect he had not consulted with any other potential Provider about the bid.

48.     On June 27, 2002, at the closing for the underlying municipal securities offering, UBS AG represented in writing that UBS had not consulted with any other potential Provider about its bid, its bid was determined without regard to any other formal or informal agreement with any other person, and was not given the opportunity to review other bids before submitting its own bid.  Because of UBS's conduct, the statements in the UBS AG certification were false.

49.     UBS AG arranged to have copies of the false representations provided to the Rhode Island Municipality and/or its agents.

***Transaction Five***

50.     Transaction Five involved using a Swap to facilitate an improper, undisclosed payment to a Bidding Agent.  In October 2002, a California Municipality publicly offered $620 million of purportedly tax-exempt municipal securities.  Among other items, this financing required the bidding of a $77.9 million GIC.   Bidding Agent A acted as Bidding Agent on behalf

of the California Municipality.

51.     Bidding Agent A rigged the bid for the benefit of Provider E.  The award to Provider E took place near the close of business on the day of the bid, but the Provider E representative was able to immediately hedge the transaction with a $77.9 million notional amount interest rate swap with UBS AG, arranged by a UBS representative who had previously worked at Bidding Agent A.  The UBS representative in turn generated an internal trade ticket for the Swap that listed the fixed interest rate on the swap to be paid by UBS as 2.525%.

52.     The next morning, an officer at Bidding Agent A asked the Provider E representative about the need for a hedge, and was surprised to learn that the Swap had already been arranged.  The Bidding Agent A officer then asked how much money Bidding Agent A was going to receive through the Swap, and the Provider E representative responded with 3 basis points, which Bidding Agent A found to be an acceptable amount.  The Provider E representative then called back the UBS representative, and asked him to both reduce the previously agreed rate to be paid by UBS AG to Provider E on the Swap from 2.525% to 2.495% and make a corresponding improper, undisclosed payment to Bidding Agent A of $59,000, which was equivalent to the net present value of the change in the interest rates on the Swap.  As a result of this arrangement, Provider E paid the $59,000 by virtue of receiving a lower interest rate from UBS AG on the Swap, and the additional interest payments to UBS AG were offset by its payment to Bidding Agent A.

53.     UBS's swap documentation made no mention of this $59,000 payment; to the contrary it affirmatively stated that there was no broker involved in the transaction, thereby concealing the existence of the $59,000 payment from individuals at Provider E, other than those who participated in the fraud.

16

*Transaction Six*

54.     Transaction Six was a Courtesy Bid.  In June 2002, a Municipality located in New Jersey publicly offered $162.8 million of purportedly tax-exempt securities.  Among other matters, the financing required the bidding for the purchase of a portfolio of governmental securities with a maturity value of $66 million.  Bidding Agent A conducted the bidding on behalf of the New Jersey Municipality.

55.     On the afternoon of the bidding, a representative of Bidding Agent A telephoned a representative at Provider A and asked him at what price he wanted to win the bidding.  In particular, the Bidding Agent asked Provider A for a "wish" number and a "tight on the screws" number.  In response, Provider A's representative told Bidding Agent A that, although he really did not want to be there, his "tight on the screws" number was $58,060,000, but the "right" number would be $58,125,000.   After a slight pause, the representative of Bidding Agent A offered Provider A the opportunity to win at a price of $58,115,000, which Provider A's representative thought was "wonderful."

56.     Bidding Agent A asked UBS to provide a Courtesy Bid.  A representative of UBS then submitted a deliberately non-winning bid of $58,124,000.  In that bid, UBS falsely represented that Bidding Agent A had not provided it with any information that induced it to bid at a yield lower than the yield induced by the bid request, the bid was determined without regard to any formal or informal agreement with the issuer or any other person, and the bid was not being submitted solely as a courtesy bid for purposes of satisfying the requirements of the applicable regulations.

57.     UBS arranged to have copies of its false representations provided to the New Jersey Municipality and/or its agents.

## CLAIM FOR RELIEF

### Violation of Section 15(c)(1)(A) of the Exchange Act

58.     The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 57, inclusive, as if they were fully set forth herein.

59.     At all relevant times, Defendant UBS was a registered broker-dealer pursuant to Section 15(b) of the Exchange Act [15 U.S.C. § 78o(b)].

60.     As alleged herein, Defendant UBS, directly or indirectly, used the mails or the means or instrumentality of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, securities by means of a manipulative, deceptive, or other fraudulent device or contrivance.

61.     UBS's fraudulent misrepresentations and omissions described above were made either knowingly or recklessly.

62.     By engaging in the foregoing conduct, UBS violated, and unless enjoined and restrained will continue to violate, Section 15(c)(1)(A) of the Exchange Act [15 U.S.C. § 78o(c)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a final judgment:

### I.

Permanently restraining and enjoining UBS from violating, directly or indirectly, Section 15(c) of the Exchange Act [15 U.S.C. § 78o(c)];

## II.

Ordering UBS to disgorge all illegal profits that it obtained as a result of the fraudulent conduct described in this Complaint, and to pay prejudgment interest thereon;

## III.

Imposing civil monetary penalties on UBS pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

## IV.

Granting such equitable relief as may be appropriate or necessary pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)].

Respectfully submitted,

BY: *Mary P. Hansen*

Mary P. Hansen
Attorney for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION
Philadelphia Regional Office
701 Market Street, Suite 2000
Philadelphia, PA 19106
Telephone: (215) 597-3100
Facsimile: (215) 597-2740
hansenm@sec.gov

Of Counsel:
Elaine C. Greenberg
Daniel M. Hawke
Mark R. Zehner
G. Jeffrey Boujoukos
Scott A. Thompson

## Certification

      Pursuant to Local Rule 11.2, I certify that the matter in controversy alleged in the foregoing Complaint is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.

By:    s/Mary P. Hansen_____
          Mary P. Hansen
          Attorney for Plaintiff
           Securities and Exchange Commission
          701 Market Street, Suite 2000
          Philadelphia, PA 19106